UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAKSHANDA TALIB-GRACE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY, et al.,<br><br>Defendants. | Case No.: 25-cv-03698-AJB-DEB<br><br>**ORDER ON MOTIONS TO DISMISS**<br><br>**(Doc. Nos. 21; 24)** |

Before the Court are two motions to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure: one filed by Defendants County of San Diego ("the County"), Kieko Fukue, Theresa Palafox, Edgar Timpug, Bianca Bates, and Rex Padilla (collectively, "County Defendants") (*see* Doc. No. 21) and one filed by Defendants NaphCare, Inc. and Tony Underwood (collectively "NaphCare Defendants") (*see* Doc. No. 24). For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** County Defendants' motion to dismiss and **GRANTS** NaphCare Defendants' motion to dismiss in its entirety.

## I.    BACKGROUND

The instant action centers on the tragic decompensation and death of Karim Talib ("Decedent") in San Diego Central Jail on July 29, 2025. (*See generally* Doc. No. 1, Compl.) Decedent was an 82-year-old wheelchair-bound man who "suffer[ed] from early

onset of dementia, hypertension, bowel and urinary incontinence, and . . . mobility impair[ment] due to his frail condition." (*Id.* at 34.) Decedent resided at a senior care facility that provided "full assistance" with Decedent's "activities of daily living" ("ADLs"), "medication management," and "enrichment activities." (*Id.* ¶¶ 35, 39.) On August 5, 2024, Decedent was arrested for physical assault of his roommate at the senior care facility and was booked at the San Diego County Jail, where he remained pending prosecution. (*Id.* ¶ 35–36.) On December 24, 2024, Decedent was deemed incompetent and transferred to Metro State Hospital for competency restoration; however, around May 14, 2025, Decedent "was determined to have no substantial likelihood to gain competency." (*Id.* ¶¶ 37–38.) At this point, the state clinician "specifically recommended [Decedent] would be placed in a mental health facility where he will be 'best served and cared for by qualified professional,'" similar to the senior facility he had been residing in." (*Id.* ¶ 39.) When Decedent was transferred back to San Diego County Jail on May 24, 2025, these recommendations became a part of Decedent's electronic health records at the jail. (*Id.* ¶¶ 39–40.)

From May 27, 2025 to July 19, 2025, Decedent was housed in the Medical Observation Bed unit ("MOB"), where inmates receive a 24-hour individualized care plan and frequent monitoring, "because of [Decedent's] severe 'failure to thrive' and not being able to care for himself," which required MOB staff to assist with changing his diapers and other basic ADLs. (*Id.* ¶¶ 41, 43, 49.) There, Dr. James Veltmeyer, the doctor who oversaw care at MOB, "noted that [Decedent's] admitting diagnosis to be FTT, fall risk, wheelchair bound, needed help going to the bathroom, was incontinent both bowel and bladder, ADA mobility impaired related to advanced age, frailty, memory impairment[.]" (*Id.* ¶¶ 19, 42.) "However despite such a long list of restrictions and limitations requiring constant assistance from medical staff," and "[a]gainst policy restrictions," on July 19, 2025, Decedent was discharged by the charge nurse into an administrative segregation unit, 7/E, "with minimal assistance and observation." (*Id.* ¶¶ 51–52.)

///

25-cv-03698-AJB-DEB

From the day after Decedent was transferred to Unit 7/E until his death on July 28, 2025, other detainees consistently reported the entire unit smelled of feces; Decedent appeared unwell, was unresponsive, was in need of help, and should not be in administrative separation; Decedent's cell was accumulating uneaten food trays and untaken medications; Decedent's diaper was not being changed and his person was not being showered despite the fecal matter on his shirt, diaper, and wheelchair. (*Id.* ¶¶ 53–72.) Staff similarly reported Decedent did not or was unable to respond to questioning; was covered in feces and urine; was malodorous; was unable to care for himself; refused medication and food; was "disheveled, mute, no eye contact, withdraw, uncooperative, depressed, impoverished thoughts, slow." (*Id.* ¶¶ 57–63, 67–71.) However, staff failed to take vital signs or to conduct competency, suicide, or grave disability assessments, and ignored the concerns of other inmates about Decedent's well-being. (*Id.* ¶¶ 62, 64, 68–70, 72, 78.) On July 28, 2025, after a week of decompensation while other detainees unsuccessfully requested help on his behalf, Decedent was found dead. (*Id.* ¶¶ 72–81.)

Plaintiffs, who are Decedent's adult children, filed a complaint against Defendants asserting nine claims pursuant to federal and California-state law: (1) deliberate indifference to a substantial risk of harm to health in violation of the Fourteenth Amendment; (2) failure to train; (3) unconstitutional custom and practice; (4) ratification; (5) violation of Title II of the Americans with Disabilities Act and the Rehabilitation Act; (6) elder abuse pursuant to the California Welfare and Institutions Code § 15657; (7) negligence; (8) violation of the Tom Bane Civil Rights Act ("Bane Act"), Cal. Civ. Code § 52.1; and (9) failure to summon medical care pursuant to California Government Code §§ 844.6 and 845.6. (*See generally* Compl.) Defendants now move to dismiss the complaint for failure to state a claim. (Doc. Nos. 21; 24.)

## II.    LEGAL STANDARD

"A Rule 12(b)(6) motion tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "The court may dismiss a complaint as a matter of law for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal

25-cv-03698-AJB-DEB

claim." *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). To defeat a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"In deciding such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them." *Navarro*, 250 F.3d at 732; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations and citation omitted).

## III.    DISCUSSION

County Defendants move to dismiss every cause of action pursuant to Rule 12(b)(6) for failure to state a claim. (*See generally* Doc. No. 21.) Similarly, NaphCare Defendants move to dismiss for failure to state a claim all causes of action brought against them with the exception of the fifth cause of action. (*See generally* Doc. No. 24.) The Court addresses all arguments regarding each cause of action in turn.

### A.    Deliberate Indifference Against Individual Defendants (First Claim)

Defendants argue that Plaintiffs fail to allege sufficient facts demonstrating that each specific individual Defendant acted with deliberate indifference and that, even if Plaintiffs had alleged sufficient facts, individual County Defendants would be entitled to qualified immunity. (Doc. Nos. 21-1 at 11–18; 24 at 16–18.)

#### 1.    Deliberate Indifference Legal Standard

"Under 42 U.S.C. § 1983, a private right of action exists against anyone who, 'under color of' state law, causes a person to be subjected 'to the deprivation of any rights,

25-cv-03698-AJB-DEB

privileges, or immunities secured by the Constitution and laws.'" *Russell v. Lumitap*, 31 F.4th 729, 737 (9th Cir. 2022) (quoting 42 U.S.C. § 1983).

"[T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). "To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (quoting *Gordon*, 888 F.3d at 1125). "[P]rison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment," or when they "choose a course of treatment that is 'medically unacceptable under the circumstances.'" *Id.* at 679 (quoting first *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); then *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)).

**2.       Defendants Kieko Fukue, Theresa Palafox, and Edgar Timpug**

County Defendants assert that "Plaintiffs cannot show deliberate indifference" as to Fukue and Palafox because they do not "alleg[e] any facts that obvious signs of medical distress were visible[.]" (Doc. No. 21-1 at 13.) Instead, County Defendants proffer that neither Fukue nor Palafox "assess[ed] Mr. Talib to be at risk of serious harm" and that "[t]he allegations do not show that a reasonable clinician in defendants' position should have appreciated the high degree of risk involved." (*Id.* at 12–13.) With regard to Timpug, County Defendants assert that "Plaintiffs have offered no allegations that Nurse Timpug failed to act reasonably" when he chose to finish "pill call" before checking on Decedent,

or "that commencing the check before finishing the medication rounds would have prevented the death[.]" (*Id.* at 13–14.)

Plaintiffs respond that County Defendants "fail[] to meaningfully engage with the substance of Plaintiffs' complaint." (Doc. No. 30 at 9–13.) The Court agrees.

In the complaint, Plaintiffs allege that on July 27, 2025, Decedent was observed "moaning in the fetal position in his cell" and "unresponsive." (Compl. ¶ 66.) "[A]pproximately sixteen (16) uneaten food trays, enough for numerous days meals," along with full pill containers and scattered pills, accumulated in Decedent's cell. (*Id.* ¶ 64.) A deputy saw "Talib was in distress and called for medical attention and for a supervising deputy." (*Id.* ¶ 67.) Subsequently, Plaintiffs allege Fukue arrived, "knocked on Mr. Talib's cell door[,] and ask[ed] him if he was eating or if he was suicidal[,]" but Fukue did not conduct a competency assessment or a proper suicide/grave disability assessment, even though Decedent "did not respond to [Fukue] at any time before she left his cell." (*Id.* ¶ 69.) Plaintiffs additionally allege that, as Fukue was leaving the unit, an inmate "told her that Mr. Talib should be moved back to the medical unit because he was unwell," and Fukue ignored the request and did nothing to intervene. (*Id.* ¶¶ 70, 72.)

Plaintiffs further allege that after Fukue's visit, Palafox "was yet again referred to by another housing deputy to see Talib for a wellness check." (*Id.* ¶ 70.) Palafox "noted the smell of feces and urine," that Decedent "was soiled, malodorous[,] had uneaten food around him," and "presented disheveled, mute, no eye contact, withdraw[n], uncooperative, depressed, [with] impoverished thoughts, [and was] slow"; however, without conducting a competency assessment or a proper suicide/grave disability assessment, Palafox labeled Decedent as appearing "not to be in crisis or distress[.]" (*Id.* ¶ 70.) Plaintiffs also allege that documentation of meal refusal, like the "numerous uneaten meals" Palafox observed firsthand, "trigger[] a policy for grave disability and food monitoring[.]" (*Id.* ¶ 71.)

With regard to Timpug, Plaintiffs allege that July 26–27, 2025, Timpug "authored several medication refusals" but never conducted a competency assessment or referred

6

Decedent to a medical provider. (*Id.* ¶ 62.) Then, on the morning of July 28, 2025, an inmate alerted Timpug upon entering the unit that Decedent was dead; however, Timpug continued dispensing medications to all the cells, including Decedent's. (*Id.* ¶ 77.) At Decedent's cell, Timpug "merely placed a pill container on the tray slot of Talib's cell door without checking on his welfare and began to walk away[.]" (*Id.* ¶ 78) When an inmate yelled at Timpug that Decedent "needed urgently to be checked on," Timpug "ignored [the inmate] alerting him to Talib's dire condition." (*Id.* ¶ 78)

At this stage, presuming the truth of Plaintiffs' allegations, Decedent was a wheelchair-bound 82 year old who was documented for months as needing "infirmary level care" because of "severe 'failure to thrive'[,] not being able to care for himself," "need[ing] constant attention and care," and "requir[ing] assistance with changing his diapers and . . . [other] activities of basic daily living." (*Id.* ¶¶ 34, 39, 41, 46, 49.) Despite all that, Palafox and Fukue walked into Decedent's cell, observed he was nonresponsive, surrounded by days-worth of uneaten food, medication, and excrement, and walked out without conducting a competency, suicide, or grave disability assessment, or even checking his vitals. Similarly, Timpug witnessed the obviously troubling state of Decedent and his cell in the preceding days, was alerted twice to concerns that Decedent was in such serious risk of harm that he may be dead, and walked away. *See Sandoval*, 985 F.3d at 679 ("[A] reasonable nurse in de Guzman's position—i.e., a nurse who was told that [the decedent] was sweating, tired, and disoriented, and that 'there was still something going on' that needed to be 'look[ed] at . . . more thoroughly'—would understand that Sandoval faced a substantial risk of serious harm.").

Plaintiffs' factual allegations paint a stark picture that County Defendants gloss over, outright ignore, or dismiss as improperly holding Defendants to a higher standard of what they *should* have done based on "the benefit of hindsight[.]" (Doc. Nos. 21-1 at 12–14; 35 at 3–4 ("Instead, the clinicians here applied their medical expertise to conclude Mr. Talib was not in acute distress."), 5 ("A brief fifteen-minute delay in a medical evaluation, particularly when a nurse is already engaged in other necessary clinical duties like

25-cv-03698-AJB-DEB

medication distribution, does not rise to the level of 'reckless disregard' required under *Gordon*.").) Plaintiffs do not allege a situation where Fukue, Palafox, and Timpug provided medical care for which reasonableness would be measured in degrees. Instead, Plaintiffs allege that Fukue, Palafox, and Timpug failed to provide any amount of medical care that a reasonable healthcare provider would have under the circumstances.

Additionally, County Defendants assert that "Nurse Timpug was actively fulfilling his primary clinical duty (medication rounds) and responded to the cell shortly thereafter." (Doc. No. 35 at 5.) County Defendants seem to be assuming that Timpug "responded" after "[a] brief fifteen-minute delay" (*see id.* at 4–5) based on the allegation that "[Timpug] continued dispensing pills and no one checked on Mr. TALIB for approximately another fifteen (15) minutes." (Compl. ¶ 78.) However, the complaint does not allege that Timpug responded in any way to concerns about Decedent's status. (*See generally* Compl.) In fact, Plaintiffs clearly allege that Timpug stated an intent to defer checking on Decedent, "began to walk away" after delivering medications to the unit including Decedent's cell, and "ignored" further calls for his aid and that, "[f]inally, a custody deputy entered TALIB's cell and realized TALIB was dead." (*Id.* ¶¶ 77–79.)

Moreover, County Defendants claim that "Mr. Talib, while suffering from chronic conditions and poor hygiene, did not display the type of acute, life-threatening symptoms— such as radiating chest pain or a failure to respond to nitroglycerin—that would make the high degree of risk 'obvious' to any reasonable official." (Doc. No. 35 at 4.) County Defendants draw the line of what they would view "life-threatening symptoms" at too narrow scope and without regard to the circumstances alleged by Plaintiffs. At this stage, Plaintiffs allegations of days of uneaten food, untaken medication, and unsanitary conditions compounded by Decedent's non-responsiveness and other inmates' concerns for his survival are sufficient to allege a substantial risk of serious harm that a reasonable official would have appreciated. Drawing all reasonable inferences in Plaintiffs' favor, Fukue, Palafox, and Timpug's actions—or lack thereof—can be viewed as objectively unreasonable under the circumstances alleged.

Finally, County Defendants assert that "there is no causal link between the alleged failures and Mr. Talib's death on July 28, 2025." (Doc. Nos. 21-1 at 15; 35 at 5–6.) County Defendants may proffer evidence supporting their assertions about a lack of causation at the appropriate stage of litigation. Here, however, Plaintiffs have alleged that the failures of Palafox, Fukue, and Timpug to take any action that a reasonable official in their positions would—such as taking Decedent's vitals, assessing his status, providing prompt medical attention, referring him to a higher level of care, or closely monitoring him—caused Decedent's death. (*See* Compl. ¶¶ 87, 90–93.) This is adequate at the pleading stage. *See, e.g.*, *Est. of Alvarado v. California*, No. CV 25-4059 PA (JPRX), 2025 WL 2018560, at *4 (C.D. Cal. July 1, 2025) (collecting cases).

Accordingly, the Court holds Plaintiffs have sufficiently alleged that (1) Decedent was in an obvious and substantial risk of suffering serious harm when observed by Palafox, Fukue, and Timpug, (2) a reasonable official under the circumstances would appreciate the severity of Decedent's condition, (3) Palafox, Fukue, and Timpug unreasonably did nothing to abate that risk, and (4) their failure could have resulted in Decedent's death. *See Gordon*, 888 F.3d at 1125; *see, e.g.*, *Est. of Bartolacci by & through Bartolacci v. Cnty. of San Diego*, No. 3:24-CV-1156-WQH-JLB, 2026 WL 376387, at *19 (S.D. Cal. Feb. 10, 2026) ("The Court also finds that a reasonable official in the same circumstances would have appreciated Roselee's critical condition, regularly monitored her weight, contacted the Regional Center per California law and Sheriff's Department policy, and developed a more robust treatment plan to address her immediate needs upon finding her in a deteriorated state on May 28, 2023, hours before her death."); *Est. of Arroyo*, 2024 WL 4668146, at *10 (finding allegations that a deputy observed the pre-trial detainee "unconscious on the floor of his cell but did not take action" were sufficient to state a claim for deliberate indifference under the Fourteenth Amendment); *Est. of Silva v. City of San Diego*, No. 3:18-cv-2282-L-MSB, 2020 WL 6946011, at *10–11 (S.D. Cal. Nov. 25, 2020) (denying motion to dismiss deliberate indifference claims against Sheriff's Department officials who observed detainee's signs of decompensation during cell checks but failed to

25-cv-03698-AJB-DEB

call for medical assistance); *Pajas v. Cnty. of Monterey*, No. 16-CV-00945-LHK, 2016 WL 3648686, at *10 (N.D. Cal. July 8, 2016) (finding allegations that a nurse failed to render medical assistance or check the decedent's vital signs sufficient to adequately allege deliberate indifference at the motion to dismiss stage).

### 4.   Defendants Bianca Bates, Rex Padilla, and Tony Underwood

Defendants also move to dismiss Plaintiffs' first cause of action as to Bianca Bates, Rex Padilla, and Tony Underwood for failure to allege sufficient fact specific to these individuals. (*See* Doc. Nos. 21-1 at 14–15 ("As to Nurses Bates and Padilla, not yet served, the Complaint contains only threadbare recitals of their titles and roles without specifying their personal involvement in the alleged constitutional deprivation. . . . Plaintiffs have asserted a claim against Nurse Bates and Nurse Padilla in their individual capacities, but they fail to plead facts to show any personal involvement by either Nurse Bates or Nurse Padilla in providing or making decisions regarding Mr. Talib's care."); 24 at 17–18 ("The Complaint contains no allegation that Defendant Underwood participated in or directed Mr. Talib's care. . . . The Complaint contains no allegation that Defendant Underwood participated in or directed Mr. Talib's care. In The Complaint does not list, let alone detail, any act, omission, interaction, or intentional decision made by Underwood related to Mr. Talib.").)

In response, Plaintiffs argue that allegations that Bates, Padilla, and Underwood in their capacity as healthcare providers knew or should have known about Decedent's "visible decline" but chose to take no action. (*See* Doc. Nos. 30 at 10–11 ("Plaintiff's Complaint alleges that Rex Padilla, in his capacity of Supervising Registered Nurse, knew or should have known of Decedent's visible decline but like the other Defendants did not engage Decedent in medical care despite his obvious condition and allowed his deterioration to continue until death. Likewise, Plaintiff's Complaint asserts that Defendant Bates, in her capacity as a certified nurse's assistant, was an active and knowing participant in the series of medical-staff failures constituting deliberate indifference as Defendant's employees ignored Decedent's deterioration and medical decline." (citing to Compl. ¶¶ 26,

87–92)); 31 at 9–10 ("Plaintiffs' Complaint alleged Defendant Underwood as an individually sued clinician and is pleaded among those who 'failed to take vitals,' 'failed to refer to higher level of care,' and 'deliberately indifferent.').)

Unlike the specificity of the allegations regarding Palafox, Fukue, and Timpug, the only allegations against Bates, Padilla, and Underwood are to state their titles and then to include them in the group pleading of the first cause of action. Specifically, Plaintiffs allege that each was employed "at the San Diego Central Jail and was a was a duly authorized employee and agent of Defendant COUNTY and/or NAPHCARE, and was acting within the course and scope of his perspective duties" in the jail, with Bates employed as a certified nurse's assistant, Padilla as a supervising registered nurse, and Underwood as a nurse practitioner. (Compl. ¶¶ 22, 24, 26.)[1] Without specific allegations tying Bates, Padilla, and Underwood to the care of Decedent, the subsequent group pleading is insufficient. *See, e.g.*, *Victoria v. City of San Diego*, 326 F. Supp. 3d 1003, 1019 (S.D. Cal. 2018) ("[G]roup pleading does not provide Defendants fair notice of the claims against them.").

Plaintiffs fail to allege sufficient facts to state a claim against Bates, Padilla, and Underwood. Accordingly, the Court **GRANTS** Defendants' motions to dismiss the first cause of action as to those three individual defendants.

### 5.    Qualified Immunity

County Defendants assert that Fukue, Palafox, and Timpug are entitled to qualified immunity because (1) Plaintiffs fail to state a claim for a constitutional violation and (2) there is no "controlling precedent where an elderly inmate . . . suffering from early onset dementia, hypertension, bowel and urinary incontinence . . . was observed by mental health clinicians and nurses but ultimately died due to jail staff's failure to do some unspecific act." (Doc. No. 21-1 at 15–18.)

---

[1]    The Court notes that the complaint misgenders Bates by using this identical allegation for each individual defendant.

"[S]tate officers are entitled to qualified immunity from a § 1983 suit unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Russell*, 31 F.4th at 737 (quoting *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Wesby*, 583 U.S. at 63.

With regard to the first prong, as discussed *supra*, the Court has found Plaintiffs sufficiently state a claim against Fukue, Palafox, and Timpug for violating the Fourteenth Amendment. *See Sandoval*, 985 F.3d at 680 ("[A] prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition.").

Turning to the second prong, the Ninth Circuit has repeatedly held that "there is a clearly established duty to provide an arrestee or detainee with objectively reasonable medical care in the face of a serious medical need creating a substantial and obvious risk of harm, including by calling for medical assistance." *D'Braunstein v. California Highway Patrol*, 131 F.4th 764, 773 (9th Cir. 2025) (collecting cases). "Officers may not act with objective deliberate indifference to such a medical need. Any reasonable officer would appreciate this well-established obligation." *Id.* at 771.

County Defendants' argument that no case law is sufficiently specific to make the actions and inaction of Fukue, Palafox, and Timpug clearly unlawful exceeds the specificity required, especially at this stage of proceedings. "[F]or purposes of qualified immunity's 'clearly established' prong, there does not have to be a case directly on point[,] . . . [and] there is no requirement that the very action in question has previously been held unlawful." *D'Braunstein*, 131 F.4th at 773 (citations and internal punctuation omitted); *see also Russell*, 31 F.4th at 737–38 ("It is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity. Instead, a clearly established right is one that is sufficiently clear that every reasonable official would have

12

understood that what he is doing violates that right."). In fact, by arguing that "every case in jails and prisons (and the complex physiological, environmental, diagnostic, and behavioral issues and circumstances that precede it) is unique," County Defendants have taken the legally unsound stance that every suit against jail employees for deliberate indifference should be dismissed due to qualified immunity.[2]

Because the duty to provide a detainee like Decedent with objectively reasonable medical care in light of a serious medical need was clearly established at the time and, viewing the facts in the light most favorable to Plaintiffs, the actions and inactions of Fukue, Palafox, and Timpug were medically unacceptable under the circumstances, the individual County Defendants are not entitled to qualified immunity at this time. *See D'Braunstein*, 131 F.4th at 773. Accordingly, the Court **DENIES** County Defendants' motion to dismiss the first cause of action as to Fukue, Palafox, and Timpug.

### B.    *Monell* Claims Against Entity Defendants

Plaintiffs assert three causes of action against entity Defendants pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978): (1) failure to train, (2) unconstitutional custom and practice, and (3) ratification. (*See* Compl. ¶¶ 101–22.)

"[L]iability under *Monell* may be premised on any of three theories: (1) that a [municipal] employee was acting pursuant to an expressly adopted official policy; (2) that a [municipal] employee was acting pursuant to a longstanding practice or custom; or (3) that a [municipal] employee was acting as a final policymaker." *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). "In order to establish liability for governmental entities under *Monell,* a plaintiff must prove (1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the

---

[2]    Considering "unique" means a thing is "the only one," "without a like or equal," and "unlike anything or anyone else." *Unique*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unique.

moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (cleaned up); *see also Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 734 (9th Cir.), *cert. denied,* 146 S. Ct. 298 (2025) (citation omitted) ("A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights.").

Entity Defendants move to dismiss all three *Monell* causes of action for failure to state a claim. (Doc. Nos. 21-1 at 18–24; 24 at 18–24.) The Court will address Defendants' arguments regarding each cause of action in turn.

### 1.    Failure to Train (Second Claim)

Defendants move to dismiss the failure to train *Monell* claim, arguing that Plaintiffs fail to "identif[y] a constitutionally deficient training policy or linked said training policy to Mr. Talib's death." (Doc. Nos. 36 at 5; 21-1 at 22–23 ("Plaintiffs' factual allegations describe only a single incident without identifying the purportedly deficient training policy. Without any facts supporting the existence of an unconstitutional training program, the Court cannot infer from the single instance of misconduct alleged in the Complaint that such a policy exists, or that the policy could be unconstitutional. Plaintiffs have therefore not pled facts that are sufficient to show any deliberate or conscious policy choice by the County in training its medical personnel."); 24 at 19–21.) NaphCare further alleges that, in addition to not "identify[ing] a single deficient NaphCare training program, policy, or procedure[,]" Plaintiffs do not allege any "facts that establish what relationship, if any, NaphCare has to the training of medical providers at the Jail, including any facts that NaphCare developed any training." (Doc. No. 24 at 20–21.)

Plaintiffs respond that "highlighting these general and policy training failures[] and incorporating the prior allegations in their Complaint" is sufficient to state a claim because they have "identif[ied] several instances of Defendant's failure to train and its leading to Decedent's decompensation and demise." (Doc. No. 30 at 18–19; 31 at 10–12.)

///

14

25-cv-03698-AJB-DEB

"Failure to train may constitute a basis for *Monell* liability where the failure amounts to deliberate indifference to the rights of those who deal with municipal employees." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989)). "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Id.* at 1153–54. "While deliberate indifference can be inferred from a single incident when 'the unconstitutional consequences of failing to train' are 'patently obvious,' an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Willcox*, 23 F.4th 863, 874–75 (9th Cir. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

In the complaint, Plaintiffs allege that both the County and NaphCare had policies governing medical professionals that entity Defendants failed to adequately train employees on how to implement, the failure of which amounted to deliberate indifference and caused Talib pain, agony, and death. (Compl. ¶¶ 101–10.) Specifically, Plaintiffs identify five policies promulgated by the County's Sheriff's Department Medical Services Division: (1) a "policy requiring nursing staff identify any patients having a medical or psychiatric condition that requires special housing" (*Id.* ¶ 104), (2) a "policy requiring that Patients who have been found 'Incompetent to Stand Trial' and subsequently refuse treatment be reported to their attending psychiatrist and conservator" (*Id.* ¶ 105), (3) a "policy requiring that a physician (MD) or registered nurse (RN) [to] evaluate all medical emergencies, provide Basic Life Support (BLS) and request appropriate transportation in response to such emergencies" (*Id.* ¶ 106), (4) a "policy requiring that specialty health care services . . . be provided to meet a patient's medical/mental health needs" (*Id.* ¶ 107), and (5) a "policy requiring that biomedical waste and biohazardous waste (including

'feces') . . . be disposed of consistent with state and federal Regulations"[3] (*Id.* ¶ 108). For notice, Plaintiffs assert that the County knew that "San Diego Central Jail was not equipped to care for seriously ill patients, patients with severe disabilities, and/or patients with serious mental health issues," and that "such patients could not be properly observed and monitored in general population, much less in the administrative segregation unit." (*Id.* ¶ 102.) As such, Plaintiffs allege that, "[g]iven the known limitations of the San Diego Central Jail, it was obvious that jail medical staff would need special training in order to care adequately for medically unstable patients and to assess when such patients should be transferred to the hospital and/or housed in the jail's medical unit." (*Id.* ¶ 102.)

Plaintiffs have sufficiently alleged a Fourteenth Amendment violation and that the constitutional violation would not have resulted if County Defendants properly trained their employees. However, Plaintiffs do not identify with sufficient factual allegations a training policy that amounts to deliberate indifference. In fact, Plaintiffs do not identify any training policies. Rather, Plaintiffs point to constitutional policies and argue that failure to adequately train on those policies is unconstitutional. *Cf. Benavidez*, 993 F.3d at 1154 (holding that failure to follow a policy "does not support *Monell* liability on the basis of that policy"). Without factual allegations explaining what the training policy was, Plaintiffs fail to allege sufficient facts to support the conclusion that the training was defective, regardless of the tragic outcome. *See Hyde*, 23 F.4th at 874–75. Accordingly, the Court **GRANTS** Defendants' motions to dismiss the second cause of action.[4]

### 2.    Unconstitutional Custom and Practice (Third Claim)

The County moves to dismiss the unconstitutional custom and practice *Monell* claim, arguing (1) "restating the allegations that gave rise to the constitutional injuries is

---

[3]    Plaintiffs allege failure to train on this last policy against "Defendant COUNTY and Defendant WELLPATH." (*Id.* ¶ 108.) "Wellpath" is not a defendant in this action and appears nowhere else in the complaint.

[4]    Because the Court finds that Plaintiffs fail to sufficiently allege any unconstitutional training policy, the Court need not address arguments specific to NaphCare.

insufficient," (2) "they only plead acts or omissions related to their own experience," and (3) Plaintiffs fail to plead a constitutional violation against individual Defendants and a causal link between the County's custom. (Doc. No. 21-1 at 18–21.)

Similarly, NaphCare argues that Plaintiffs do not provide facts demonstrating *NaphCare* has a custom or practice of sufficient duration, frequency or consistency and that it was the moving force behind deprivation of Decedent's constitutional rights. (Doc. No. 24 at 22.)

"Under *Monell v. Department of Social Services*, the County can be liable under § 1983 if its 'policy or custom' caused [the detainee's] injuries through deliberate indifference to his constitutional right to adequate medical care." *Sandoval*, 985 F.3d at 681. "Relying on the language of § 1983, the [Supreme] Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citation omitted). *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691) ("The custom must be so 'persistent and widespread" that it constitutes a "permanent and well settled city policy.'"). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

In the complaint, Plaintiffs allege that Defendants "knowingly maintained, enforced and applied an official recognized county custom, policy, and practice of: housing inmates with serious mental illness and/or serious disabilities in administrative segregation without consideration of mental health and/or medical professionals' input, Acting deliberately indifferent to the serious medical needs of inmates and newly booked inmates when defendants failed to take any meaningful corrective measures despite being previously placed on notice of their egregious practices resulting in prior deaths." (Compl. ¶ 112; *see*

*also id.* ¶ 83 ("MR. TALIB was the seventh person to die in a San Diego County jail in the year of 2025.").) Plaintiffs go on to allege "a list of *Monell* violations" including:

> (a)   housing inmates with serious mental illness and/or serious disabilities in administrative segregation without consideration of mental health and/or medical professionals' input;

> (b)   Failing to implement policies and procedures on basic symptom recognitions and assessment of inmates who are in medical distress, and mental health conditions;

> (c)   Routinely failing to train detention staff and medical staff on the symptoms and assessment of inmates suffering from serious and chronic medical conditions such as dementia.

> (d)   Inadequately supervising, training, controlling, assigning, and disciplining employees including COUNTY Jail medical and correctional staff;

> (e)   Routinely neglecting and ignoring gravely ill inmates and enabling the custom and practice of medically distressed detainees relying upon themselves or their fellow detainees to seek emergency medical treatment;

> (f)   Routinely failing to seek prompt follow-up care for known medical issues that pose a serious risk to an inmate's health;

> (g)   Engaging in the custom and practice of discriminating against chronically ill inmates and/or mentally ill inmates and withholding emergency medical treatment until an inmate is at a near-death condition;

> (h)   Routinely preventing inmates access to medical doctors, due to a custom and practice of a failed booking policy;

> (i)   Routinely failing to manage inmates with mental health conditions, and/or chronic medical conditions;

> (j)   Routinely failing to hospitalize patients and or refer to higher level of care when need; and

> (k)   Routinely failing to properly implement protocols for managing the medical care for inmates with chronic medical conditions.

(*Id.* ¶ 112.)

Plaintiffs argue that "heightened pleading standards" do not apply to *Monell* claims, but rather all that is necessary is "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." (Doc. Nos. 30 at 16 –

17 (quoting *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012)); 31 at 13 (same).) In *AE ex rel. Hernandez*, the Ninth Circuit summarized the holding of *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), and then stated that it applied to *Monell* claims. *AE ex rel. Hernandez*, 666 F.3d at 637. *Starr* itself identified that, through *Twombly* and *Iqbal*, the Supreme Court set forth a standard wherein plaintiffs must allege sufficient factual allegations to (1) give "fair notice" to the opposing party and (2) "plausibly suggest an entitlement to relief[.]" *Starr*, 652 F.3d at 1216. *Starr*, and by extension *AE ex rel. Hernandez*, did not reaffirm the pre-*Iqbal*/*Twombly* notice pleading standard. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("We have applied *Twombly* and *Iqbal*'s plausibility standard in two recent cases. In *Starr* . . . , we analyzed the apparent shift in the Supreme Court's analysis of Rule 8 pleading standards, comparing the 'more demanding' *Twombly* and *Iqbal* standard to the 'more lenient' rule applied in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) and *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam)."). Thus, Plaintiffs' reliance on cases applying the outdated notice pleading standard to *Monell* claims is unavailing. The Court, instead, will apply the plausibility pleading standard to Plaintiffs' claims.

Contrary to the County's assertions, Plaintiffs do more than "ascribe[] Defendants' alleged misconduct to official policy in a conclusory fashion," *see Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1061 (9th Cir. 2019), by detailing specific customs and practices Plaintiffs allege Defendants implemented, (*see* Compl. ¶ 112). However, beyond calling these practices and customs, Plaintiffs provide no factual allegations to support that they were so persistent and widespread as to be a permanent policy. *See Trevino*, 99 F.3d at 918. The only factual support Plaintiffs provide in support of the alleged practices and customs are those related to the one-week between when Decedent was transferred to an administrative segregation unit and his death. This one incident is insufficient to allege state a *Monell* claim based on custom or practice. *See Benavidez*, 993 F.3d at 1154 ("However, one instance of County employees violating the constitutional rights of parents

19

25-cv-03698-AJB-DEB

and children is insufficient to demonstrate a custom supporting *Monell* liability."); *see also Manlove v. Cnty. of San Diego*, 759 F. Supp. 3d 1057, 1067 (S.D. Cal. 2024) ("The extent of the pleaded facts are thin: apart from the one-off incident Plaintiff complains of, there are no allegations of any widespread or persistent custom that may rise to the level of policy."); *Puga v. Monterey Cnty. Dep't of Soc. & Emp. Servs.*, No. 25-CV-04655-BLF, 2025 WL 3567159, at *5 (N.D. Cal. Dec. 12, 2025) ("Plaintiffs assert repeatedly that the County has various policies, customs, or practices. But the only facts they include relate to the circumstances of Plaintiffs and unsubstantiated references to the existence of the County's policies and practices. Plaintiffs invoke other 'known' cases but do not identify them. Thus, Plaintiffs fail to plausibly allege *Monell* theories predicated on the County's customs or practices.").

Plaintiffs argue a custom may be inferred here from a pattern of behavior toward one individual, specifically repeated denials of medical care to Decedent. (Doc. Nos. 30 at 15–16 (relying on *Oyenik v. Corizon Health Inc.*, 696 F. Appx. 792, 794 (9th Cir. 2017)) and *Bell v. Mahoney*, No. 2:18-CV-05280-PA-KES, 2019 WL 6792793, at *14 (C.D. Cal. Aug. 29, 2019)); 31 at 12–13 (same).) Both cases upon which Plaintiffs rely involve more allegations than are present here. *Oyenik*, 696 F. Appx. at 794–95 (inferring a custom of deliberate indifference to prisoners' serious medical needs from "at least a dozen instances of Corizon denying or delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of almost a year"); *Bell*, 2019 WL 6792793, at *13 (finding sufficient allegations that the plaintiff was "explicitly told the County and LASD enforce a policy at the Jail" and that the plaintiff specifically was harmed by experiencing implementation of that policy). Unlike *Oyenik*, the alleged repeated denial of care occurred over the span on one week to one individual. Further, unlike *Bell*, Plaintiffs do not allege Defendants or their employees ever affirmatively acknowledged these practices and customs as the County's policies. Without more, Plaintiffs allegations are insufficient to demonstrate a policy of deliberate indifference through widespread custom and practice based on the experiences of Decedent alone.

25-cv-03698-AJB-DEB

Additionally, Plaintiffs do not address the conflicting allegations that the County has both a written policy that "*at no point in time* after an inmate returns from a state hospital should that inmate ever be housed into a segregation unit" and a custom or practice of "housing inmates with serious mental illness and/or serious disabilities in administrative segregation without consideration of mental health and/or medical professionals' input[.]" (*Compare* Compl. ¶ 45 (emphasis in original) *with* ¶ 112.)

Finally, Plaintiffs appear to argue that Defendants' failure to take corrective action permits the inference that these policies existed. (Doc. Nos. 30 at 17 ("An, [sic] inference of the existence of these policies may be drawn from the lack of corrective action alleged by Plaintiffs."); 31 at 14 (same).) To the extent Plaintiffs are arguing that no corrective action was taken after Decedent's death, no such allegations are included in the complaint. (*See generally* Compl.) *Cf. McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after the [unconstitutional] shakedown [committed by the guards], the prison officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error. The record is silent as to what action the officials took after the shakedown."). To the extent Plaintiffs are relying on the six prior deaths in the jail that year, Plaintiffs do not allege that the other deaths involved similar circumstances such that it can be inferred that these alleged policies were a cause. (*See id.* ¶ 83 (sole reference to the other deaths).)

Because Plaintiffs do not provide sufficient allegations to plausibly suggest the customs and practices identified were widespread and persistent, Plaintiffs fail to state a *Monell* claim based on custom and practice. Accordingly, the Court **GRANTS** Defendants' motions to dismiss the third cause of action.

### 3.    Ratification (Fourth Claim)

Defendants move to dismiss the ratification *Monell* claim, arguing that Plaintiffs' "boilerplate" and "conclusory" allegations are insufficient to state a claim. (Doc. Nos. 21 at 23–24; 24 at 23–24.) Plaintiffs counter that, "[t]aken at face value," the allegations throughout the entire complaint state a "viable claim." (Doc. Nos. 30 at 21; 31 at 16.)

25-cv-03698-AJB-DEB

In the complaint, Plaintiffs allege that

> Defendants COUNTY and NAPHCARE and their employees had either actual or constructive knowledge of the deficient policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions, and specifically, through the finding and conclusions of any incident review(s) examining and evaluating the events leading up to Mr. TALIB's injuries and death on July 28, 2025, and have ratified all conduct vis-à-vis Mr. TALIB from named defendants, including Defendants Doe 1 through 10.

(Compl. ¶ 119.)

"[A] local government may be held liable under Section 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gordon*, 6 F.4th at 974 (cleaned up); *see also Praprotnik*, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). "[T]he 'final policymaker' [theory] focuses on a specific person or persons, their authority, their knowledge, and what they said and did on a specific occasion to ratify a specific decision." *Hartzell*, 130 F.4th at 735. "We have found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino*, 99 F.3d at 920 (collecting cases).

Beyond stating "through the finding and conclusions of any incident review(s) examining and evaluating the events leading up to Mr. TALIB's injuries and death" Defendants "ratified all conduct vis-à-vis Mr. TALIB," Plaintiffs proffer no other specific factual allegations addressing (1) who wrote the "incident review(s)," if any, (2) what evaluations any incident review(s) made regarding the circumstances of Talib's death, and (3) how those findings and conclusions "condoned," "tolerated," or otherwise "ratified all conduct" of individual Defendants. (*See generally* Compl.) Without identifying that the incident reports were the work of an individual with final policymaker and what the reports found, these conclusory allegations of the complaint are insufficient to state a claim for

ratification. *See, e.g.*, *Guy v. Lorenzen*, 547 F. Supp. 3d 927, 949–50 (S.D. Cal. 2021) (finding similar allegations insufficient because it was "nothing more than a mere recitation of the elements of a ratification theory"); *Schindler v. Contra Costa Cnty.*, No. 21-CV-02984-JSW, 2023 WL 2414864, at *6 (N.D. Cal. Mar. 8, 2023) (finding allegation that the director of an agency defendant who "had final control over the policies and practices" and whose "signature was on every report, memo and recommendation" were "vague[,] generalized[,] and lack[ed] sufficient factual support to state a *Monell* claim based on a theory of ratification"); *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 803 (N.D. Cal. 2021) (finding the plaintiff failed to state a claim where the complaint "failed to plead facts as to *how* policymakers ratified police conduct").

Accordingly, the Court **GRANTS** Defendants' motions to dismiss the fourth cause of action.

### C.    ADA and Rehabilitation Act (Fifth Claim)

Plaintiffs fifth cause of action asserts violations of Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Section 504") against all Defendants. (Compl. ¶¶ 123–36.) County Defendants move to dismiss the claim for failure to allege discriminatory intent (Doc. No. 21-1 at 24–25), while NaphCare Defendants mention a stipulation to dismiss this cause of action in their notice of motion (Doc. No. 24 at 2).

#### 1.    Legal Standard

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Section 504[, which] similarly prohibits disability discrimination by recipients of federal funds," has been "interpreted coextensively [with the ADA] because there is no significant difference in the analysis of rights and obligations created by the two Acts." *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) (citations omitted).

"To state a claim under Title II of the ADA, the plaintiff must allege: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1021 (9th Cir. 2010) (quoting *McGary v. City of Portland,* 386 F.3d 1259, 1265 (9th Cir. 2004)). "The elements of a prima facie Section 504 claim are similar, with the additional requirement that the plaintiff prove that the program receives federal financial assistance." *Payan*, 11 F.4th at 738 (citation omitted).

### 2.    County Defendants

County Defendants move to dismiss the fifth cause of action, arguing the complaint "lacks the critical allegation" that Talib "was denied medical services and psychiatric treatment for his physical and health conditions" "solely by reason of his disability[.]" (Doc. No. 21-1 at 25.) Without "any allegation to suggest any discriminatory intent" or discrimination, Plaintiffs' "ADA and Rehabilitation Act claims only amount to a claim that Mr. Talib received inadequate treatment for a disability," which is insufficient under both the ADA and Section 504. (*Id.*)

Plaintiffs respond that, because Defendants "acted with deliberate indifference toward Decedent, a qualified individual," by *inter alia* "ignoring his dementia condition, wheelchair dependence, [and] incontinence," Defendants "thereby intentionally discriminated against him on the basis of his disabilities." (Doc. No. 30 at 24–25 (relying on, among others, *Atayde v. Napa State Hosp.*, 255 F. Supp. 3d 978 (E.D. Cal. 2017) ("In the jail medical care context specifically, the District Court for the Eastern District of California found deliberate indifference by a state nurse hospital where the nurse was aware of a court order committing detainee to state hospital, knew of a high degree of risk involved if detainee remained at a county jail, and ultimately failed to heed requests to finalize his admission to hospital.").)

As County Defendants only address the fourth element of an ADA or Section 504 claim, the Court only addresses whether Plaintiffs sufficiently allege that the denial of medical care to Talib was "by reason of" his disability. In the complaint, Plaintiffs allege that "Defendants showed a bias towards treating his mental illness impairment when Defendants failed to send him to an outside facility capable of providing Mr. TALIB with a higher level of care in response to his disabilities," by "fail[ing] to provide any management and treatment specific to his mental and physical disabilities as well as his obvious presentation of signs of mental and physical decompensation," and "by failing to provide a non-abusive, safe treatment environment at the San Diego Central Jail generally[.]" (Compl. ¶ 135.) Additionally, Plaintiffs allege that Decedent "was transferred to the MOB because of severe 'failure to thrive' and not being able to care for himself, despite a state recommendation that he would have to be cared for by a facility equipped with handling senior living." (*Id.* ¶ 41; *see also id.* ¶ 39 (describing the recommendation as included in his "Recommended Continuing Care Plan/Discharge Summary" to place Decedent in a mental health facility where he could receive full assistance with ADLs and medication management, which Plaintiffs allege MOB was not).)

Plaintiffs do not allege a situation where County Defendants treated his disability but did so inadequately. *Cf. Simmons*, 609 F.3d at 1022 (holding that deprivation of a program that would have lessened an inmate's depression, regardless of the jail's reason, was not cognizable under the ADA because it alleged "inadequate treatment for disability" not "discrimination because of disability"). Rather, Plaintiffs allege County Defendants acted with deliberate indifference in depriving Decedent with any care to address disability-related need. *See Atayde*, 255 F. Supp. 3d at 1001–02 (collecting cases) ("Circuit courts have identified ADA or [Section 504] violations in cases where the denial of medical care is so extreme as to suggest discriminatory refusal to accommodate a disability-related need, such as when a disabled detainee is denied a broad range of medical services beyond those necessary for treating his underlying disability."). Specifically, Plaintiffs allege County Defendants failed to transfer Decedent to a facility that would provide full

25

assistance with ADLs as his disability required and County Defendants did not provide that support with ADLs themselves, such as by failing to change his diapers, clean him, and help him consume meals. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) (stating "deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" plausibly violates the ADA); *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 843 (N.D. Cal. 2020), *aff'd,* 58 F.4th 1283 (9th Cir. 2023) (finding correctional staff "failed on numerous occasions to reasonably accommodate the disabilities of class members" by failing to provide "showers and cleaning supplies . . . for inmates with incontinence problems").

County Defendants strangely assert that Plaintiffs' complaint and opposition are "devoid of any factual allegation to suggest discriminatory intent." (Doc. Nos. 21-1 at 25; 35 at 9.) However, as noted by Plaintiffs (*see* Doc. No. 30 at 22), for purposes of both Title II of the ADA and Section 504, the Ninth Circuit has "determine[d] that the deliberate indifference standard applies" to the "intentional discrimination requirement." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). Throughout the complaint, Plaintiffs allege County Defendants knew about Decedent's need for accommodation both because of the State's recommendation that was incorporated into Decedent's file with the jail and because such accommodation was obviously necessary. (*See, e.g.*, Compl. ¶¶ 39, 41–42, 53–60, 64–72, 89, 133.) Thus, Plaintiffs sufficiently allege the notice prong of the deliberate indifference test. *See Duvall*, 260 F.3d at 1139 ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test."). Moreover, based on the extent of Plaintiffs' allegations, County Defendants' inaction with regard to Decedent's obvious need for accommodation rises to the level of deliberateness. *Id.* at

25-cv-03698-AJB-DEB

1139–40. Accordingly, Plaintiffs have alleged discriminatory intent sufficient to state a claim at this early state of litigation.

County Defendants' motion to dismiss the fifth cause of action is **DENIED**. *See Atayde*, 255 F. Supp. 3d at 1003 (finding the plaintiff stated an ADA claim by alleging that the defendants failed to transfer decedent to a mental health hospital for treatment of his disability in violation of a state court order and thereby precluding the decedent from receiving treatment).

### 3.    Naphcare Defendants

The notice preceding NaphCare Defendants' motion states that "Plaintiffs' counsel agreed that the Fifth Claim is due to be dismissed and stipulated to its dismissal as to Defendants NaphCare, Inc., and Tony Underwood." (Doc. No. 24 at 2.) However, no such agreement is reflected on the docket as a joint motion, NaphCare Defendants' motion does not move for dismissal of the claim, and Plaintiffs' opposition fails to address, let alone corroborate, such a stipulation. (*See* Doc. Nos. 24; 31.) Accordingly, considering that NaphCare Defendants do not move to dismiss this claim, it remains as to NaphCare Defendants.

### D.    Elder Abuse and Dependent Adult Abuse (Sixth Claim)

Plaintiffs' sixth cause of action asserts violations of California's Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welf. & Inst. §§ 15657 et seq. (Compl. 137–40.) County Defendants assert that Talib is not a "dependent adult" and the San Diego County Jail where he "was housed does not qualify as a 'correctional treatment center' as defined by the [Elder Abuse Act]." (Doc. No. 21-1 at 26–28.) NaphCare Defendants move to dismiss the claim for Plaintiffs' failure to allege a custodial relationship between themselves and Decedent. (Doc. No. 25 at 24–25.)

"The Legislature enacted the Elder Abuse Act to protect elders and other dependent adults from 'gross mistreatment in the form of abuse and custodial neglect.'" *Holland v. Silverscreen Healthcare, Inc.*, 18 Cal. 5th 364, 376 (2025) (quoting *Delaney v. Baker*, 20 Cal. 4th 23, 33 (1999)). "Section 15657 of the Welfare and Institutions Code provides

25-cv-03698-AJB-DEB

heightened remedies to a plaintiff who can prove 'by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57,' and who can demonstrate that the defendant acted with 'recklessness, oppression, fraud, or malice in the commission of [this] abuse.'" *Winn v. Pioneer Med. Grp., Inc.*, 63 Cal. 4th 148, 152 (2016).

"Neglect" is defined as "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." Cal. Welf. & Inst. Code § 15610.57(a)(1). "Neglect includes, but is not limited to . . . [f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter[, f]ailure to provide medical care for physical and mental health needs[,] . . . [ and f]ailure to prevent malnutrition or dehydration." Cal. Welf. & Inst. Code § 15610.57(b). The term "dependent adult" is restricted to individuals between the ages of 18 and 64 years. Cal. Welf. & Inst. Code § 15610.23. "'Elder' means any person residing in this state, 65 years of age or older." Cal. Welf. & Inst. Code § 15610.27. The "care or custody" element requires "the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." *Winn*, 63 Cal. 4th at 158.

First, Plaintiffs' allegations are unnecessarily imprecise when alleging applicability of the Elder Abuse Act to Decedent. (*See* Compl. ¶¶ 3 ("Mr. Talib was an elderly and/or dependent adult within the meaning of Welfare and Institutions Code section 15610.27 and 15610.23, respectively."); 48 ("At all times relevant to this complaint, due to mental and physical limitations described above, Mr. TALIB could not carry out normal activities or protect his rights and was a dependent adult.").) However, Plaintiffs clearly allege that Decedent was 82 years old. (*Id.* ¶¶ 34, 87.) As such, County Defendants are correct that Plaintiffs do not state a claim for Decedent as a dependent adult, a point which Plaintiffs themselves concede. (*See* Doc. No. 30 at 25 ("Defendant correctly identifies the mistaken

28

reference of Decedent as a qualified adult rather than an elder[.]"). However, County Defendants fail to acknowledge that Plaintiffs have sufficiently alleged Decedent qualified as an elder under the statute. Moreover, County Defendants point to no restrictions on location of abuse applied to elders. As such, the Court **GRANTS** County Defendants' motion to the extent Plaintiffs allege a claim under the Elder Abuse Act for a dependent adult, **DISMISSES** the dependent adult theory of that claim to the same extent **without leave to amend**, and **DENIES** the motion as to the sixth cause of action in all other respects.

Second, the Court concurs with NaphCare Defendants that Plaintiffs do not sufficiently allege a custodial relationship between Decedent and NaphCare or its employees. Plaintiffs allege that NaphCare, a private corporation, was contracted by the County to "provide][ correctional healthcare services at the San Diego Central Jail[.]" (Compl. ¶ 18.) Every individual defendant is identified as "a duly authorized employee and agent of Defendant COUNTY and/or NAPHCARE," but in the instant motion NaphCare only identifies Underwood as an employee. (*Id.* ¶¶ 19–31.) No additional facts are alleged against either Underwood or NaphCare, although both are included in general conclusory group-pled allegations throughout the rest of the complaint. (*See generally* Compl.)

In opposition, Plaintiffs assert that "Defendant Naphcare had a custodial relationship with Decedent that necessitated substantial caretaking of Decedent," relying on specific factual allegations about Talib's condition and those general conclusory group-pled allegations regarding NaphCare. (Doc. No. 31 at 17–18.) The allegations regarding Decedent are sufficient to establish both his dependency and neglect at this stage, which NaphCare itself acknowledges in part, (*see* Doc. No. 24 at 25). However, NaphCare's motion focuses on sufficiency of the "care or custody" requirement. (*See id.* at 24–26.) Although Plaintiffs allege a contractual relationship between NaphCare and the County, Plaintiffs fail to provide factual allegations linking NaphCare to Decedent such that the former plausibly had "care or custody" of the latter. *See Winn*, 63 Cal. 4th at 165 ("Plaintiffs cannot bring a claim of neglect under the Elder Abuse Act unless the defendant

25-cv-03698-AJB-DEB

health care provider has a caretaking or custodial relationship with the elder or dependent adult."). As such, the Court **GRANTS** NaphCare Defendants' motion to dismiss the sixth cause of action.

### E.   Negligence and Failure to Summon Care (Seventh and Ninth Claims)

The County moves to dismiss Plaintiffs' negligence and failure to summon medical care claims on the basis that the County is immune pursuant to California Government Code §§ 844.6(a) and 845.6. (Doc. No. 21-1 at 28 ("Section 844.6 states that 'a public entity is not liable for . . . (2) [a]n injury to any prisoner.'") (alterations in original), 29 ("Government Code section 845.6 provides immunity to public employees for injuries 'caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody.'").)

In opposition, Plaintiffs do not distinguish between the common law negligence claim and the statutory failure to summon medical care claims. (Doc. No. 30 at 26–27.) Specifically, Plaintiffs argue that California Government Code § 845.6 provides an exception to the § 844.6 immunity for public entities where an "employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." (*Id.* at 26 (quoting Cal. Gov't Code § 845.6).) Relying on this exception, Plaintiffs point to allegations that "Timpug knew that Decedent may have been dead, a condition requiring immediate medical response to confirm or otherwise apply life-saving tactics and simply did not react to that information and went about his ordinary business." (*Id.* at 27 (citing Compl. ¶¶ 73–78).)

In reply, the County asserts that "once Mr. Talib had passed away, immediate medical care was not necessary" and that allegations that "Mr. Talib was not thriving, was at times not eating, or was lying in his cell[] do not rise to the level of a serious and obvious medical condition requiring immediate care." (Doc. No. 35 at 10 (citation omitted).)

California Government Code § 844.6 provides that "a public entity is not liable for . . . [a]n injury to any prisoner," excepts as provided in, *inter alia*, § 845.6. Cal. Gov't Code § 844.6(a)(2). More specifically, [n]either a public entity nor a public employee is

liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody[.]" Cal. Gov't Code § 845.6. However, "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." *Id.* "Taken together, this California statutory scheme stands for the proposition that: (1) public entities cannot be held liable for wrongfully or negligently injuring prisoners but public employees can be; unless (2) the prisoner's injury resulted from a failure to furnish medical care (in which case, neither the public employee or public entity are liable); except (3) when the public employee knew or had reason to know that the injured prisoner was in need of immediate medical care and failed to take reasonable action to summon such medical care (in which case, both the public employee and the public entity are liable)." *Bousman v. Cnty. of San Diego*, No. 3:23-CV-1648-W-JLB, 2024 WL 1496220, at *11 (S.D. Cal. Apr. 5, 2024).

Based on this statutory structure, Plaintiffs' negligence claim against the County would not be barred by immunity to the extent it is premised on a failure to summon medical care. *See, e.g.*, *Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017) ("These same policies, procedures, actions, and omissions in failing to summon medical care may also form the basis of a negligence claim against the County Defendants."). Turning to substance, in the complaint, Plaintiffs allege Timpug was alerted by an inmate that Decedent "needed to be urgently checked on" for fear he may be dead, but Timpug first continued to dispense medication to other cells, then dispensed medication to Decedent's cell "without checking on his welfare," and finally walked away "ignore[ing the inmate] alerting him to Talib's dire condition." (Compl. ¶¶ 77–78.) Plaintiffs have sufficiently alleged that Timpug knew Decedent was "in need of immediate medical care" and failed to take any action to summon such medical care. *See* Cal. Gov't Code § 845.6. Thus, Plaintiffs' negligence and failure to summon claims are sufficiently pled to state a claim. *See, e.g.*, *Est. of Arroyo v. Cnty. of San Diego*, No. 3:21-CV-01956-RBM-SBC,

25-cv-03698-AJB-DEB

2024 WL 4668146, at *20 (S.D. Cal. Nov. 4, 2024) ("[T]he County of San Diego may be held liable for any officer's failure to summon medical care when he or she observed Arroyo lying face down, unconscious on the floor of his cell but did nothing."); *Greer v. Cnty. of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2020 WL 1864640, at *7 (S.D. Cal. Apr. 14, 2020) (finding a delay of 15 minutes between when the plaintiff was knocked unconscious and when he was found by jail staff because the staff had silenced the intercom and ignored yells of the plaintiff's cellmates to state a claim for failure to summon and common law negligence).

The County's argument that Decedent was subsequently determined to have died does not undermine Plaintiffs' allegations. At essence, the County is disputing the facts alleged by Plaintiffs, which is not proper at this stage of litigation. *See, e.g.*, *Woodward v. Cnty. of San Diego*, No. 17-CV-2369-JLS (KSC), 2018 WL 3343793, at *3 (S.D. Cal. July 9, 2018) ("Taking Plaintiffs' allegations as true, the officers [who first secured the aggressive inmate] failed to 'immediately' summon medical care to Lyle [who had blood pooled around his head on the floor], and the Court does not decide at this stage whether the officers' actions were reasonable."). Taking Plaintiffs' allegations as true, as required at this stage, the complaint alleges sufficient facts to infer that the County employees failed to take reasonable action to summon the necessary medical care for Decedent and, thus, the County may be held vicariously liable.

Accordingly, the County's motion is **DENIED** as to Plaintiffs' failure to summon claim and **DENIED** to Plaintiffs' negligence claim, to the extent the latter is premised on the theory of the former. Both the seventh and ninth claims also remain as to Does 6–8, as they were not subject to the County Defendants' motion. *See, e.g.*, *Bousman*, 2024 WL 1496220, at *11.

### F.     Bane Act (Eighth Claim)

County Defendants move to dismiss Plaintiffs' eighth cause of action brought pursuant to the Bane Act because "Plaintiffs do not sufficiently allege that the County Defendants violated Mr. Talib's constitutional rights." (Doc. No. 21-1 at 30.) NaphCare

Defendants similarly move to dismiss because "Plaintiffs have not asserted any allegations specifically related to the NaphCare Defendants" and, as such, "have not adequately pled a deliberate indifference claim against the NaphCare Defendants[.]" (Doc. No. 24 at 26–27.)

The Bane Act "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'" *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1). "The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022). "[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018). Thus, "a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs adequately states a claim for relief under the Bane Act because deliberate indifference claims extend far beyond ordinary tort claims and have been associated with affirmatively culpable conduct." *Cravotta v. Cnty. of Sacramento*, 717 F. Supp. 3d 941, 964 (E.D. Cal. 2024) (cleaned up) (collecting cases).

In the complaint, Plaintiffs assert "Defendants acted with reckless disregard in failing to closely monitor, and treat Mr. TALIB's medical conditions as described more fully above," "by continuing to house Mr. TALIB in general population[,] and [by] failing to hospitalize him or otherwise escalate his level of care despite his showing visible signs of significant physical and mental deterioration." (Compl. ¶ 149.) Essentially, Plaintiffs allege the same conduct that constitutes their deliberate indifference claims forms the basis of the Bane Act claim. (*See id.* ¶ 147 n.2 (proffering cases where adequately pleading a claim for deliberative indifference supports the elements of a Bane Act claim).)

///

///

25-cv-03698-AJB-DEB

Because the Court has found that Plaintiffs sufficiently allege deliberate indifference to a substantial risk of harm in violation of the Fourteenth Amendment as to Fukue, Palafox, and Timpug, Plaintiffs have sufficiently alleged a Bane Act claim premised on the same conduct as to those three individuals. *See, e.g.*, *Est. of Arroyo*, 2024 WL 4668146, at *20 ("Because the Court finds Plaintiffs have adequately alleged claims for deliberate indifference against [individual County defendants], the Court also finds Plaintiffs have adequately alleged Bane Act claims against those same defendants."); *Schmidt v. Cnty. of San Diego*, No. 23-CV-0899-W-DDL, 2024 WL 4308793, at *15 (S.D. Cal. Sept. 26, 2024) ("As discussed above, the SAC sufficiently alleges objective deliberate indifference against Nurse Suaking and the Doe Defendants. Accordingly, the SAC sufficiently alleges a Bane Act claim against these defendants."). However, Plaintiffs' Bane Act claim fails as to Bates, Padilla, and Underwood for the same reasons their deliberate indifference claim fails. *See, e.g.*, *Cravotta*, 717 F. Supp. 3d at 965. Accordingly, the Court **GRANTS** Defendants' motions to dismiss the Bane Act claims as to those three individual defendants.

## IV.    CONCLUSION

Based on the foregoing reasons, the Court **GRANTS** NaphCare Defendants' motion to dismiss (Doc. No. 24) and **GRANTS in part** and **DENIES in part** County Defendants' motion to dismiss (Doc. No. 21). The Court **ORDERS** as follows:

1.    County Defendants' motion to dismiss is **GRANTED** as to:

    a.    The first and eighth causes of action as to Bates and Padilla only;

    b.    The second, third, and fourth causes of action in their entirety; and

    c.    The sixth cause of action to the extent Plaintiffs allege a claim under the Elder Abuse Act for a dependent adult.

2.    County Defendants' motion to dismiss is **DENIED** in all other respects.

3.    NaphCare Defendants' motion to dismiss is **GRANTED** in its entirety.

4.    Plaintiffs are **GRANTED** leave to amend to address the deficiencies identified herein.

5.      If Plaintiffs choose to file an amended complaint, it must comply with the limited leave granted herein and be filed **no later than <u>July 8, 2026</u>**. Plaintiffs must concurrently file a red-lined version of the amended complaint in compliance with Civil Local Rule 15.1.c. If Defendants wish to respond to the amended complaint pursuant to Rule 12, such a motion must be limited to the causes of action which Plaintiffs substantively amended.

     **IT IS SO ORDERED.**

Dated:  June 24, 2026

                  Hon. Anthony J. Battaglia
                  United States District Judge

25-cv-03698-AJB-DEB